UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

    - against -

CURT MATTHEWS <u>et.</u> <u>al</u>,

        Defendants.

- - - - - - - - - - - - - - - X

<u>REPORT AND</u>
<u>RECOMMENDATION</u>

03-CR-1214 (ERK)(MDG)

GO, United States Magistrate Judge:

    The defendant, Curt Matthews ("Matthews"), who is charged
with, <u>inter</u> <u>alia</u>, murder and bank robbery, moves to suppress
certain post-arrest statements.  On May 13, 2004, the Honorable
Edward R. Korman referred the motion to the late United States
Magistrate Judge A. Simon Chrein for report and recommendation.
On April 11, 2005, the case was reassigned to the undersigned.

<b><u>PROCEDURAL HISTORY</u></b>

    Matthews and five other individuals were indicted on
November 6, 2003 in a three-count indictment for armed bank
robbery in Queens on December 4, 2000 (the "armed bank robbery").
<u>See</u> ct. doc. 1.  On January 6, 2005, a grand jury returned a
fourteen-count Superseding Indictment (S-1) charging Matthews and
others with racketeering, racketeering conspiracy, conspiracy to
distribute drugs, attempted murder, murder, bank robbery and bank
robbery conspiracy.  <u>See</u> ct. doc. 88.

By Notice of Motion dated May 6, 2004, Matthews moved, <u>inter alia</u>, for an order (1) directing the government to provide a bill of particulars pursuant to Fed. R. Crim. P. 7(f) and 16 and (2) suppressing any post-arrest statements,[1] or granting a hearing to determine the admissibility of such statements. In an interim report and recommendation dated July 30, 2004, Judge Chrein recommended that (1) Matthews's request for a bill of particulars be denied and (2) Matthews be granted a hearing to determine whether he was presented to a magistrate judge "without unnecessary delay" and whether Matthews' post-arrest statements made on January 31, 2004 should be suppressed. On September 21, 2004, Judge Korman adopted this report and recommendation in its entirety. <u>See</u> ct. doc. 65.

On December 3, 2004, Judge Chrein held a hearing on Matthews's motion to suppress and reserved decision. Before issuing his report and recommendation, he became terminally ill and this case was reassigned to me. At a conference held on March 15, 2005, I ordered a further hearing so I could hear the testimony afresh on the voluntariness of Matthews's post-arrest statements. Accordingly, the suppression hearing was continued on June 8, 2005.

Following the June 8th hearing, defense counsel was permitted to inspect the original advice of rights form. The Court also inspected the original document.

_____

[1] Matthews seeks to suppress only the statements made at an interview on January 31, 2004, but not statements he made at the time of his arrest concerning the location of a gun. Transcript of Suppression Hearing Held on December 3, 2004 and June 8, 2005 ("Tr.") at 4-7.

On August 1, 2005, I denied the government's motion to quash a subpoena compelling the Atlanta Pretrial Detention Center to produce inmate movement logs but modified the scope of the subpoena.  See Order dated August 1, 2005 (ct. doc. 151).  Each party made additional submissions regarding the timeliness of Matthews's presentment.  See ct. docs. 158, 164.

## FINDINGS OF FACT

This Court makes the following findings of fact based on the testimony presented by the parties and the exhibits admitted into evidence at a suppression hearing on December 3, 2004 and June 8, 2005.  At the December 3, 2004 hearing, the government presented the testimony of Special Agents Perry Meador of the Florida Federal Bureau of Investigation ("FBI") and Thomas MacDonald of the New York FBI.  In addition to these two agents, Agent Brandon Waller of the New York FBI and New York City Police Detective Michael Newman testified for the government at the June 8, 2005 hearing.  Defendant Matthews also testified at the second hearing.

On October 24, 2003, this Court issued a warrant for Matthews's arrest for the armed bank robbery.  Tr. at 12, 60-61. In November 2003, Special Agent MacDonald informed Special Agent Perry Meador that Matthews had fled New York and may be staying with his friend Larry Bush in a residence located at 5068 Golf Link Court, Stone Mountain, Georgia (the "residence").  Tr. at 11-12, 14, 46-47, 115.  Based on this information, Agent Meador began surveillance of the residence.  Tr. at 13, 53, 115-116.

While conducting surveillance on Friday, January 30, 2004, Agent Meador saw Bush and a black male exit the residence at approximately 2:30 p.m. and drive away in a silver Mitsubishi Montero.  Tr. at 13, 14, 126-27.  At that point, Agent Meador believed that Matthews was the unidentified black male in the car with Bush.  Tr. at 14.  Sometime between 2:00 and 3:00 p.m., Agent Meador contacted and advised Agent MacDonald that he was following a vehicle in which he believed Matthews was a passenger.  Tr. at 77, 213.  Agent Meador and his partner, Cynthia Meyers, followed the car for several miles before initiating a traffic stop and arresting Bush and the unidentified man.  Tr. at 15.

Sometime after 3:00 p.m., Agent Meador learned from informants that Matthews was in the residence.  Tr. at 15, 53-54, 93-94, 119.  At approximately 4:30 p.m., Agents Meador and Meyers, together with approximately eight other law enforcement officers, entered the residence and placed Matthews under arrest.  Tr. at 13, 15-16, 20, 126.  Agent Meador explained to Matthews the grounds for the arrest, but no one informed Matthews of his Miranda rights.  Tr. at 16, 119, 224-25, 227.  The agents then transported Matthews to the Atlanta FBI office (the "FBI Office") for processing.  Tr. at 16-17.

Under the standard procedure in the Northern District of Georgia in effect on January 30, 2004, only persons arrested before 2:00 p.m. are presented that same day for an initial appearance before a magistrate judge at the federal courthouse for the Northern District of Georgia.  Tr. at 18-19, 24.  If an

-4-

arrest occurs after 2:00 p.m., the arrestee must be housed at the Atlanta Pretrial Detention Center (the "Detention Center") until brought before a magistrate judge for an initial appearance the next business day. Tr. at 19, 24, 120. Initial appearances are not conducted on weekends. Tr. at 24-25. Because it was after 2:00 p.m. when Matthews was arrested, Matthews was taken to the Detention Center, rather than to a federal courthouse for his initial appearance. Tr. at 20, 57-58.

Sometime between 4:30 and 5:00 p.m., Agent Meador called Agent MacDonald to inform him of Matthews's arrest. Tr. at 39, 61. Agent Meador also informed Agent MacDonald that Matthews would not be presented for an initial appearance before a magistrate judge until Monday, February 2, 2004. Tr. at 62-63, 75-76, 131, 214. Agent MacDonald told Agent Meador that he would travel to Atlanta from New York and attempt to interview Matthews. Tr. at 39-40, 62, 130. Agent MacDonald then contacted Special Agent Waller and Detective Newman to ask them to accompany him to Atlanta. Tr. at 78, 151, 176.

The following day, Saturday, January 31, 2004, Agent MacDonald, Agent Waller and Detective Newman boarded a 10:30 a.m. flight from New York to Atlanta, Georgia. Tr. at 62, 167-68, 194. When the plane landed in Atlanta at approximately 12:30 p.m., Agent MacDonald called to inform Agent Meador of their arrival. Tr. at 38, 62-63, 108. Agent Meador, in turn, notified the Detention Center's personnel that he and others were coming to the Detention Center to meet with Matthews. Tr. at 27, 38, 108.

Agent Meador met Agents MacDonald and Waller and Detective Newman outside of the Detention Center at approximately 2:00 p.m. Tr. at 27, 40, 63, 108, 144, 189, 195. After entering the Detention Center, the agents were taken to an empty "pod," which consisted of a large common area surrounded by jail cells. Tr. at 41, 64, 109, 168. In the common area, there are tables where the prisoners can play checkers or watch television. Tr. at 41.

At approximately 2:30 p.m.,[2] Matthews was brought into the common area of the pod. Tr. at 27, 65, 109, 132, 190, 195-96. Before interviewing Matthews, Agent MacDonald advised Matthews of his Miranda rights both orally and in writing. Tr. at 28, 65, 110, 145, 169-70, 197. After orally advising Matthews of his rights by reading a standard FBI form FD-395 ("FD-395"), Agent MacDonald wrote the time, "2:29 p.m.," and "01-31-03" for the date, at the top of the form. Tr. at 67, 110, 112, 134, 135, 148, 169-70, 197, 198-99, 216-17; Exh. 2. Matthews appeared alert and coherent when he was informed of his rights and appeared to understand those rights. Tr. at 28, 65, 111, 146, 170, 197.

After reading the FD-395 aloud, Agent MacDonald placed it on the table in front of Matthews. Tr. at 110, 135, 145, 169-70, 197, 216. Matthews appeared to read the FD-395 and said "no problem, I will talk to you." Tr. at 66, 110-11, 139, 147, 197, 217. Matthews then signed the FD-395 acknowledging that he had

---

[2] Agent MacDonald testified that between fifteen and twenty-five minutes elapsed from the time the agents entered the Detention Center until Matthews was brought into the pod. Tr. at 215-16.

read the form, understood his rights and was willing to answer questions without a lawyer present. Tr. at 66, 68, 110-12, 147-48, 169-70, 197, 199. The form was passed around the table, and Agents MacDonald, Meador, Waller and Detective Newman signed as witnesses. Tr. at 29, 67, 112, 147, 176, 198-99. Agent Waller, the last agent to sign the form, looked at his watch and wrote down the time, "2:30 p," at the bottom of the page. Tr. at 176. Agent Waller also corrected the year at the top of the form by writing a "4" over the "3." Tr. at 174, 178, 198.

Agent MacDonald proceeded to question Matthews about various crimes. Tr. at 72, 79-86, 157. Agent MacDonald testified the interview was conducted as "a very cordial conversation." Tr. at 79, 201. None of the agents took notes because they did not want to create an "official atmosphere" and make Matthews "uneasy."[3] Tr. at 73-74, 202, 208-09. Matthews was not handcuffed or otherwise restrained during the interview.[4] Tr. at 133, 190, 196, 216, 237. None of the agents threatened or coerced Matthews into speaking, or made promises of leniency to Matthews. Tr. at 31, 72, 88, 114, 136, 149, 173, 201-02. Matthews was poised and calm during the interview. Tr. at 149, 172, 201. He did not appear ill, nor did he complain about any medical problems.[5] Tr. at 133, 163, 172, 190, 201, 212. Matthews never requested an

_____

[3] The agents memorialized their recollections in writing after the interview. Tr. at 160, 187, 202-04.

[4] Agent MacDonald testified that he could not recall whether Matthews was in leg shackles, Tr. at 196, but the other agents said there were no restraints.

[5] At the time of the interview, Agent MacDonald was not aware that Matthews had ulcerated colitis. Tr. at 212.

attorney either before or during the interview and never asked to terminate questioning.  Tr. at 30-31, 43-44, 71, 88, 113, 135, 148-49, 161-62, 171-72, 184-85, 199-200, 211-12.

The interview lasted between thirty and forty-five minutes. Tr. at 31, 43, 71, 113, 201.  Over the course of the interview, Matthews admitted his involvement in many crimes.  Tr. at 72-73, 79-86, 149, 173, 201-202.  However, Matthews refused to discuss certain topics, responding when asked about two homicides, "I want to leave that alone for now."  Tr. at 30-31, 72, 88, 113, 161, 172, 185, 200, 219.  In these instances, Agent MacDonald moved to another subject matter, although he asked multiple questions about the shooting of Darrel Matthews.  Id. at 172, 186, 201, 219.

On Monday, February 2, 2004, Matthews made his initial appearance before a federal magistrate judge at the federal courthouse.  Tr. at 25, 57-58.

Assessment of Evidence Presented

The above findings were based on the testimonies of the agents and detective, whom I found credible and persuasive.  The defendant presented a very different version of the interview.

Matthews testified that the only statements he made to the agents during the interview were that he did not want to speak to them and that he wanted to speak with his lawyer.  Tr. at 245, 249-50.  He denied having been orally advised of his Miranda rights and claimed he signed the FD-395 after reading only the first line because he was told the interview would end if he

signed.[6]  Tr. at 232-33, 235.  He further stated that he
requested a lawyer four or five times and asked to stop the
interview three or four times.  Tr. at  234.  Although he told
the agents that he did not want to speak to them, he claimed he
was unaware that he had the right to refuse to speak with the
agents or that he had a right to have a lawyer present during the
interview.  Tr. at 241-242, 244-45.  However, he admitted he had
been arrested more than ten times.  Tr. at 242-43.

     According to Matthews, Agent MacDonald said he would "crush
him" if Matthews did not cooperate.  Tr. at 234-235.  Matthews
claimed he was scared and nervous and did not understand the form
given his eighth or ninth grade level of education.  Tr. at 235-
36.  He further claimed that he was shackled and handcuffed
during the interview and was feeling sick due to ulcerative
colitis.  Tr. at 232-34, 236-37.

     Besides finding Matthews generally not credible, I found his
selective unfamiliarity with Miranda rights to be incredible
given his significant criminal history.  Despite his purported
ignorance of his rights and fear, Matthews claimed he asked
several times during the interview for a lawyer and to terminate
questioning.  Matthews was particularly not believable when he
testified that he had never been informed of his Miranda rights
and was unaware of his right to remain silent and to have an
attorney.  Tr. at 241-43, 245; see United States v. Redditt, 87
Fed. Appx. 440, 445 (6th Cir. 2003) (defendant who had been

_____

     [6] According to Matthews, the law enforcement officials did
not sign or date the FD-395 in his presence.  Tr. at 260.

arrested several times knew <u>Miranda</u> rights); <u>United States v.</u>
<u>Bradley</u>, 234 F.3d 363, 366 (8th Cir. 2000) (defendant "had been
arrested on a prior occasion and presumably knew his legal
rights"); <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir.
1990) (defendant's prior encounter with criminal justice system
"increased [his] awareness of the rights of accused persons");
<u>United States v. Heredia-Fernandez</u>, 756 F.2d 1412, 1416 (9th Cir.
1985) (defendant who had been arrested 15 times in the past ten
years "might fairly have been presumed to be familiar with
<u>Miranda</u> rights procedures"); <u>United States v. Lord</u>, 565 F.2d 831,
840 (2d Cir. 1977) ("Having been arrested three times prior to
the occasion at issue, [defendant] was familiar with his
rights").

Thus, I reject defendant's testimony and credit the
testimonies of Agent MacDonald and the other officers. <u>See</u>
<u>United States v. Wyche</u>, 307 F. Supp.2d 453, 464 (E.D.N.Y. 2004)
(court credits sworn testimony of detective over defendant
regarding whether defendant requested attorney during
interrogation); <u>United States v. Simmons</u>, No. 02-CR-314, 2003 WL
145261, at *5 (E.D.N.Y. Jan. 9, 2003). The testimonies of
government witnesses were both persuasive and consistent as to
important aspects of the arrest and interview: that Agent
MacDonald administered <u>Miranda</u> warnings before commencing the
interview; that Matthews appeared to be alert and to understand
the warnings given; and that Matthews waived those rights orally
and signed the FD-395 before questioning commenced. Tr. at 28,
65-66, 68, 110-12, 139, 145, 147-48, 169-70, 197, 199, 217. The

agents credibly testified that no threats nor promises of
leniency were made to Matthews and Matthews never requested an
attorney nor asked for the interview to cease.  Tr. at 30-31, 43-
44, 71-72, 88, 113-14, 135-36, 148-49, 161-62, 171-73, 184-85,
199-202, 211-12.

After the hearing, I inspected the original Advice of Rights
form.  The defendant contended that the changes in time written
on the form and the use of two pens with different color ink
supported his view that the consent form was not signed until
after the interview.  As evident on the form, the last digit of
the year written on the line for the date at the top of the form
had been written over and changed from "2003" to "2004."  The
"2$^{30}$ p" written at the bottom of the form had also been written
over.  In an initial inspection of the original form, it appeared
from the color of the black ink that Matthews and Agent MacDonald
used the same pen to sign the form.  The time ("2$^{29}$ pm") written
at the top of the form seemed to be written with the same pen.
The date written at the top of the form, except for the last
digit of the "2004," also appeared to be the same color ink.
While the portion of the "3" that is visible under the "4"
appears also to be written by the same pen as the rest of the
date, it was not clear what pen was used for the "4."  The
signatures of Agent Waller and the two other law enforcement
officers signing as witnesses appeared to be written with one pen
having a slightly different color black ink from the one used by
Matthews and MacDonald.  The "2$^{30}$ p" at the bottom also appeared
to be made by the second pen, except that it was not clear

whether the faint lines of the number written under the "2$^{30}$" had been written using the same pen. As a result, I initially granted the defendant's application for a "handwriting" expert, since evidence that the first pen had been used to write the "4" at the top of the form or the original time at the bottom of the form, which was written over with "2$^{30}$," could contradict Agent Waller's testimony regarding the sequence of signing.

However, upon second examination of the form and looking at the form from the back while holding it up against a bright light, the colors of the ink became quite distinct and clearly were made by at least two different pens. In addition, the "Atlanta, GA" written at the top of the form appears to be written by the second pen used by Agent Waller, as well as the faint markings under the "2$^{30}$" at the bottom of the form. There is no evidence to suggest that the "2$^{30}$" or the writing underneath was not written by Agent Waller after he signed the form or that the corrections or other writings were made to the form sometime after Matthews's interview. Accordingly, I find that the writings on the form do not in any way cast doubt on the persuasive testimonies of the agents as to the sequence of events at the interview.

## DISCUSSION

Matthews contends that his post-arrest statements made on January 31, 2004 should be suppressed because 1) he was not timely presented to a magistrate judge; 2) the agents violated his Sixth Amendment right to counsel; and 3) the agents violated

his Fifth Amendment rights and did not properly advise him of his
<u>Miranda</u> rights.

I.  <u>Delay in Presentment</u>

Matthews argues that his post-arrest statements were
obtained during an impermissible delay between his January 30
arrest and his February 2 presentment before a magistrate judge
for his initial appearance, in violation of Fed. R. Crim. P. 5(a)
and 18 U.S.C. § 3501(c).

Fed. R. Crim. P. 5(a)(1)(A) directs that "[a] person making
an arrest within the United States must take the defendant
without unnecessary delay before a magistrate judge, or before a
state or local judicial officer as Rule 5(c) provides, unless a
statute provides otherwise."  Section 3501(c) provides that a
court has the discretion to suppress a confession if the delay
between arrest and presentment is greater than six hours and is
found to be unreasonable under the circumstances.  <u>See</u> <u>United
States v. Fullwood</u>, 86 F.3d 27, 31 (2d Cir. 1996).  Fed. R. Crim.
P. 5 and 18 U.S.C. § 3501, are <i>in pari materia</i> and must be
interpreted together.  <u>See</u> <u>United States v. Ramos</u>, 605 F. Supp.
1057, 1060 (S.D.N.Y. 1985).

I find that the delay between Matthews's arrest and his
presentment before a magistrate judge was necessary and
reasonable.  The delay was entirely attributable to the lack of
an available magistrate in the Northern District of Georiga,
because arraignments are not held late in the afternoon nor on
the weekend.  Because Matthews indisputably was arrested on a
Friday after 2:00 p.m. in the Northern District of Georgia, he

was housed at the Detention Center and not brought before a magistrate judge for his initial appearance until the next business day, Monday, February 2, 2004.[7]

Many courts in this circuit have held that a delay in presentment caused by the unavailability of a magistrate judge is reasonable. See United States v. Collins, 462 F.2d 792, 796 (2d Cir. 1972) (overnight lodging was necessary period of delay); United States v. Marrero, 450 F.2d 373, 378 (2d Cir. 1971) (overnight lodging necessitated by nightime arrest did not constitute an unreasonable delay); United States v. Haouari, No. S1 00 CR. 15, 2000 WL 1593345, at *6-*7 (S.D.N.Y. Oct. 25, 2000) (overnight delay in presentment was reasonable where it was too late in the day for presentment in either Southern or Eastern Districts of New York); United States v. Frank, 8 F. Supp.2d 284, 299 n.12 (S.D.N.Y. 1998) (two day delay between arrest and presentment was reasonable where 48 hour delay is not unusual in Broward County and there was no deviation from customary processing and presentment procedures); United States v. Yanez, No. 87 CR 187-2, 1987 WL 25926, at *4 (E.D.N.Y. Nov. 18, 1987) (overnight delay in presentment due to unavailability of magistrate was reasonable). More specifically, courts have found that a weekend delay in presentment due to the district's standard practice of not holding arraignments over the weekend was reasonable. See United States v. Rubio, 709 F.2d 146, 152-54

---

[7] Even if Matthews's arrest occurred between 3:00 and 3:30 p.m. as Matthews testified, Tr. at 221, his initial appearance still could not have been held at the federal courthouse until Monday.

(2d Cir. 1983); <u>United States v. Ortega</u>, 471 F.2d 1350 (2d Cir. 1973) (overnight delay during weekend was reasonable); <u>United States v. Reyes</u>, 922 F. Supp. 818, 838-39 (S.D.N.Y. 1996); <u>United States v. Anderson</u>, No. 96 CR. 180, 1996 WL 572085, at *9-*10 (S.D.N.Y. Oct. 7, 1996); <u>accord</u> <u>United States v. Van Poyck</u>, 77 F.3d 285, 289-90 (9th Cir. 1996); <u>United States v. Mendoza</u>, 473 F.2d 697 (5th Cir. 1973); <u>United States v. Baker</u>, 888 F. Supp. 1521 (D. Haw. 1995).

Matthews further contends that if there was no federal magistrate judge available to arraign him before Monday, February 2, he should have been arraigned by "a state or local judicial officer" pursuant to Fed. R. Crim P. 5(a). His counsel has submitted a supplemental affidavit averring that at least two state magistrates sitting nearby the Detention Center were available on January 31, 2004 for arraignments. Supplemental Declaration of Michael Hueston dated August 22, 2005 at ¶¶ 3-4. However, courts have not so broadly construed the requirements of Rule 5(a).

In <u>United States v. Van Poyck</u>, 77 F.3d 285 (9th Cir. 1996), the defendant was arrested on a Friday afternoon and made his initial appearance before a federal magistrate on the following Monday because there were no federal magistrates available over the weekend. Finding that the government did not intentionally postpone nor unnecessarily delay the defendant's arraignment, the court held that the defendant's statements were admissible. <u>Id.</u> at 290. The Ninth Circuit specifically rejected the defendant's argument that Rule 5 required that he be brought to a state judge

for a more prompt arraignment, holding that Rule 5(a) does not require that a defendant be brought before a state or local judicial officer over a weekend when federal arraignments are not being held.  Id. at 290; see also Advisory Committee Notes to the 2002 Amendments to Rule 5 (confirming the "stated preference . . . that the defendant be brought before a federal judicial officer").  As the court explained, the reference to "state or local judicial officer" in Rule 5(a) was intended to address instances where the only federal magistrates in the district are ill or out of the district.  77 F.3d at 290 n.7.

Similarly, in United States v. Burgard, 551 F.2d 190 (8th Cir. 1977), the defendant was not arraigned until 24 hours after his arrest because the federal magistrate in the district was out of the city on the day of the defendant's arrest.  There, the court held that Rule 5(a) did not require that a defendant be taken to a state or local judicial officer when the magistrate was temporarily absent from the city.  551 F.2d at 194.

In any event, the requirement of presentment before a state or local judicial officer in Rule 5(a) is qualified "as Rule 5(c) provides."  Under Rule 5(c)(2), which governs any arrest effected in a district other than where the offense was committed, there is no provision for an initial appearance before a state or local judicial officer as there is under Rule 5(c)(1) as to arrest in the same district of the offense.  Compare Fed. R. Crim P. 5(c)(1)(B) ("if a magistrate judge is not reasonably available, the initial appearance may be before a state or local judicial officer") with 5(c)(2)(B)(i).  Rather, Rule 5(c)(2) specifies

that an initial appearance must be held "in an adjacent district if the appearance can occur more promptly there."  Here, there has been no showing that Matthews's arraignment could have occurred more promptly in an adjacent district.

Moreover, I find that the agents did not intentionally manipulate nor delay the timing of Matthews's arrest to prevent arraignment on the day of his arrest and thereby afford the agents an opportunity to question Matthews without an attorney. Agent Meador credibly testified that he had no reason to believe that Matthews was in the residence prior to receiving that information sometime after 3:00 p.m., on January 30, 2004.  Tr. at 53, 93, 95, 114.  In fact, despite conducting surveillance on the residence a few times a week, Agent Meador never saw Matthews prior to the arrest.  Tr. at 53, 93, 95.

In addition, Agents Meador and MacDonald both credibly testified that Agent MacDonald did not learn of Matthews's arrest until sometime between 4:30 and 5:00 p.m.  Likewise, Agent Waller and Detective Newman also testified that they were not told about Matthews's arrest until late in the day on January 30.  Tr. at 150, 179.

In any event, "[i]t is not the lapse of time but the use of the time, when the commissioner or magistrate is unavailable, to employ the condemned psychologically coercive or third degree practices [of interrogators] which is proscribed."  Marrero, 450 F.2d at 376.  Here, the delay in presentment was not used to conduct a lengthy, hostile or coercive interrogation.  See Rubio,

709 F.2d at 153; <u>United States v. Ospina</u>, No. 99 CR 73, 2000 WL
37997, at *2 (S.D.N.Y. Jan. 18, 2000); <u>Frank</u>, 8 F. Supp.2d at
298.  By Matthews's estimate, the interview lasted only twenty
minutes.  Tr. at 249-50.  Matthews was advised of his <u>Miranda</u>
rights both orally and in writing and he waived those rights both
orally and in writing.  Tr. at 28, 65-66, 68, 110-12, 139, 145,
147-48, 169-70, 197, 199, 217.  All four agents testified that no
threats nor promises of leniency were made to Matthews during the
interview.  Tr. at 30-31, 43-44, 71-72, 88, 113-14, 135-36, 148-
49, 161-62, 171-73, 184-85, 199-202, 211-12.

Under the facts here, I conclude that the delay between
Matthews's arrest and presentment was reasonable and necessary
under the circumstances.  <u>See</u> <u>Rubio</u>, 709 F.2d at 153 (no
purposeful delay in arraignment nor coercive interrogation to
warrant suppression); <u>Ospina</u>, 2000 WL 37997, at *2; <u>Frank</u>, 8 F.
Supp.2d at 299 n.12; <u>Anderson</u>, 1996 WL 572085, at *10.

II.  <u>Fifth Amendment</u>

Matthews further argues that he was not properly advised of
his <u>Miranda</u> rights nor did he voluntarily waive his <u>Miranda</u>
rights prior to the January 31 interview.

The Fifth Amendment provides that: "No person shall be
compelled in any criminal case to be a witness against himself."
U.S. Const. amend. V.  In order to safeguard the suspect's Fifth
Amendment rights, law enforcement agents conducting a custodial
interrogation are required to advise a suspect that he has the

right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to have counsel present.  See Stansbury v. California, 511 U.S. 318, 321 (1994); Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).  A defendant may waive his Fifth Amendment rights if the waiver is made voluntarily, knowingly and intelligently.  See Colorado v. Connelly, 479 U.S. 157, 168 (1986); Miranda, 384 U.S. at 444-45. In proving the validity of waiver, the government bears the burden of showing by a preponderance of evidence that the defendants voluntarily relinquished his rights and "had a full awareness of the right being waived and the consequences of waiving the right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995); see Moran v. Burbine, 475 U.S. 412, 421 (1986).

The court must examine the totality of the circumstances in determining the validity of the waiver.  See Moran, 475 U.S. at 421.  Factors that are considered include, the defendant's intelligence and education, see Stawicki v. Israel, 778 F.2d 380, 382-84 (7th Cir. 1985) (defendant with high school equivalent and average intelligence made valid waiver), the defendant's familiarity with the criminal justice system, see id. at 383-84 (waiver valid despite absence of express waiver where defendant had five prior arrests), and the defendant's physical and mental condition at the time of the interrogation, see United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (defendant's mental disabilities did not preclude finding that defendant knowingly

waived his rights); <u>United States v. Guay</u>, 108 F.3d 545, 550 (4th

Cir. 1997) ("a defendant may voluntarily waive his rights even

when in the hospital, on medication, or in pain").  Additionally,

courts must consider the conditions of the interrogation and the

conduct of law enforcement officials, including, whether there

was physical abuse, the period of restraint in handcuffs and the

use of psychologically coercive tactics."  <u>Nelson v. Walker</u>, 121

F.3d 828, 833 (2d Cir. 1997).  Other probative factors include

the location and atmosphere of the interrogation, <u>see</u> <u>Oregon v.</u>

<u>Mathiason</u>, 429 U.S. 492, 494-95 (1977), the length of the

interrogation, <u>see</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437-38

(1984), and the tone and language used by the police during the

questioning, <u>see</u> <u>United States v. Guarno</u>, 819 F.2d 28, 31-32 (2d

Cir. 1987).

Since this Court has already found that Matthews received

<u>Miranda</u> warnings and waived his rights both orally and in writing

prior to the interrogation,[8] the Court next addresses whether

Matthews's waiver was valid.

Upon a review of the record, this Court finds that Matthews

knowingly and voluntarily waived his <u>Miranda</u> rights.  In waiving

his rights and agreeing to speak with the agents, Matthews

---

[8] Matthews argues that under his version of the events at the
Detention Center, the law enforcement officials may have employed
the question first, warn later technique that was deemed
unconstitutional by a plurality in <u>Missouri v. Seibert</u>, 542 U.S.
600 (2004).  However, having determined that Matthews received
his <u>Miranda</u> warnings prior to being interrogated, <u>Seibert</u> has no
bearing on this case.

appeared to read the waiver of rights form and signed the form acknowledging that he understood his rights.  His express written and oral waiver of the right to remain silent and of the right to counsel are "strong proof of the validity" of his waiver.  <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>United States v. McDuffie</u>, No. 01 CR 808, 2002 WL 654136, at *2 (S.D.N.Y. Apr. 18, 2002); <u>United States v. Murphy</u>, 16 F. Supp.2d 397, 402 (S.D.N.Y. 1998).

There is nothing about Matthews's characteristics that suggest that he was incapable of making a knowing waiver.  When Matthews testified at the hearing, he had no difficulty speaking and comprehending English.  Nothing in the manner he testified nor the way he expressed himself suggests he lacked the intelligence to comprehend the warnings.  Although Matthews testified that he has the equivalent of an eighth grade education and must read things more than once to understand, he had no difficulty reading either the FD-395 form or the declaration he submitted in support of his suppression motion when given the documents during the hearing.  Tr. at 232, 235, 249-50, 252-54. In any event, even "an inability to read or write does not, by itself, establish that the suspect is incapable of making a voluntary and intelligent decision."  <u>United States v. Gaines</u>, 295 F.3d 293, 299 (2d Cir. 2002); <u>see</u> <u>Male Juvenile</u>, 121 F.3d at 40 (holding that juvenile with documented cognitive disabilities knowingly waived his rights); <u>United States v. Burrous</u>, 147 F.3d

111, 116-17 (2d Cir. 1998) (16 year old who was not well educated made knowing and voluntary waiver).

Importantly, having been arrested at least ten times, Matthews had ample experience to understand the rights he was waiving. See Fare v. Michael C., 442 U.S. 707, 726 (1979) (concluding that 16½ year old's prior experience with police suggests he understood Miranda rights); United States v. Pinion, 800 F.2d 976, 981 (9th Cir. 1986) ("in view of [defendant's] experience with the arrest and detention processes, his treatment by police cannot be found to have been so intimidating as to have overborne his will"). The fact that Matthews answered some of the agents' questions, but chose not to answer others, underscores that Matthews understood his rights and voluntarily agreed to make certain statements. United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996).

Although Matthews testified that he has ulcerative colitis and was "feeling sick" during the interview, I credit the agents' testimony that he did not appear ill and did not complain about any medical condition. In any event, there is no evidence that his condition "was [] so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation by his interrogators." Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding that questioning of a defendant with a "serious knife wound" who "was in significant pain" was not coercive); see United States v. Khalil, 214 F.3d 111, 121-22 (2d Cir. 2000) (although defendant who was questioned by police in hospital

while awaiting surgery for gunshot wound was in pain, his statement was knowing and voluntary). In fact, the agents credibly testified that Matthews appeared calm during the questioning. Tr. at 149, 172, 201. Moreover, the fact that Matthews was not interviewed until almost 24 hours after his arrest suggests that "he had time to reflect upon his situation and that he freely chose to waive his rights and to speak with [the agents]." United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996).

Nor did the conditions of Matthews's interrogation create a coercive environment. Matthews was questioned without handcuffs in a large common area with four agents present for about half an hour. None of the agents threatened or coerced Matthews into speaking, nor did they make promises of leniency to Matthews. As Agent MacDonald credibly testified, the tenor of the interview was conversational. Tr. at 79, 201.

Last, this Court finds that Matthews did not invoke his Fifth Amendment rights during questioning by refusing to discuss certain topics but responding to other questions. Before or during an interrogation, "[o]nce a suspect has unequivocally invoked his right to remain silent 'whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be scrupulously honored.'" Ramirez, 79 F.3d at 304 (quoting Campaneria, 891 F.2d at 1021). However, when a suspect has validly waived his Miranda rights and the suspect's subsequent conduct is not sufficiently

clear to invoke his rights, the agents may continue questioning until the suspect makes a "clear" request for an attorney or for the questioning to cease.  See Davis v. United States, 512 U.S. 452, 459-61 (1994) (right to counsel); Ramirez, 79 F.3d at 305-06 (right to remain silent).

In Ramirez, a case similar to this one, the suspect who waived his Miranda rights answered some questions, but did not respond to other questions during the interrogation.  Finding that the suspect's silence did not constitute a "clear" request to cease questioning, the Second Circuit held that the suspect did not invoke his right to remain silent and the agents' further questions did not violate his Fifth Amendment rights.  See 79 F.3d at 305 ("silence in the wake of two questions, while answering others, did not constitute even an equivocal invocation of his right to remain silent").

Similarly, I find that Matthews did not clearly invoke his right to remain silent when he indicated he did not want to answer certain questions and said, "I would like to leave that [question] alone for now."  See United States v. McElveen, 129 Fed. Appx. 42, 44 (4th Cir.) (statement, "I don't want to talk about it," was not invocation of right to remain silent), cert. denied, 126 S. Ct. 298 (2005); Brewer v. Yearwood, 30 Fed. Appx. 713, 714 (9th Cir. 2002) (statement, "I'll answer what I want," was not invocation of right to silence); United States v. Hurst, 228 F.3d 751, 759-60 (6th Cir. 2000) (refusal to answer questions about stolen firearms did not invoke right to remain silent);

<u>United States v. Al-Muqsit</u>, 191 F.3d 928 (8th Cir. 1999)

(statements that he "wasn't ready to talk about" crime or "I

don't think right now" not invocation of Fifth Amendment),

<u>vacated</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u>, 210 F.3d 820 (8th Cir.

2000). Since Matthews neither remained entirely silent nor

requested that the interrogation cease after waiving his <u>Miranda</u>

rights, the agents were under no obligation to stop questioning

Matthews. <u>See</u> <u>Ramirez</u>, 79 F.3d at 305.

Thus, based on the totality of the circumstances, I find

that Matthews voluntarily, knowingly and intelligently waived his

right to remain silent as to the entire interview.

III. <u>Sixth Amendment</u>

Matthews also argues that the agents violated his Sixth

Amendment right to counsel.

A defendant's Sixth Amendment right to counsel attaches when

adversarial judicial proceedings are initiated by way of "formal

charge, preliminary hearing, indictment, information or

arraignment." <u>Kirby v. Illinois</u>, 406 U.S. 682, 689 (1972); <u>see</u>

<u>Patterson v. Illinois</u>, 487 U.S. 285, 290 (1988); <u>United States v.</u>

<u>Yousef</u>, 327 F.3d 56, 140 (2d Cir. 2003). It is undisputed that

Matthews's right to counsel had attached by the time he was

interviewed on January 31, 2004.[9]

_____

[9] The Supreme Court has held that the Sixth Amendment right
to counsel is offense specific so that it attaches only to the
specific charges for which adversarial proceedings have been
initiated. <u>See</u> <u>Texas v. Cobb</u>, 532 U.S. 162, 164-68 (2001);
<u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991). Therefore,

Once the right to counsel has attached, the Sixth Amendment precludes the admission of statements obtained by the government outside the presence of a defendant's counsel unless the defendant waives this right.  See Yousef, 327 F.3d at 140; United States v. Scarpa, 897 F.2d 63, 67-68 (2d Cir. 1990).  The government bears the burden of proving by a preponderance of the evidence that any waiver was knowing, intelligent and voluntary.  See Patterson, 487 U.S. at 292 & n.4; Yousef, 327 F.3d at 140; Scarpa, 897 F.2d at 68.  The standard for finding a waiver is the same under the Fifth and Sixth Amendments.  See Patterson, 487 U.S. at 298-99; Scarpa, 897 F.2d at 68.

The same findings supporting the conclusion that Matthews validly waived his Fifth Amendment rights support the conclusion that Matthews also validly waived his Sixth Amendment right to counsel.  After having been informed of his Miranda rights, Matthews waived his rights orally and in writing.  After Matthews agreed to speak with the agents, he did not rescind that waiver by requesting an attorney.  He understood the rights he waived, particularly because of his previous experience.  He voluntarily made the statements, chosing to answer some of the agents' questions while refusing to answer others.  The interview was not lengthy and was conducted in a "cordial" atmosphere.  The agents did not threaten, physically intimidate or restrain Matthews

---

Matthews cannot raise a Sixth Amendment challenge to the admissibility of any statements relating to crimes for which he was not under indictment on January 31, 2004.

during the interview.  Under the totality of the circumstances, I find that he voluntarily, knowingly and intellegently waived his right to counsel throughout the interview.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that defendant's motion to suppress his post-arrest statements be denied in all respects.

Any objections to the recommendations contained herein must be filed with the Clerk of the Court, with a copy to the Honorable Edward R. Korman and the undersigned, by March 23, 2006.  Failure to file objections within the time specified waives the right to appeal.  See 28 U.S.C. § 636(b)(1); Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED**.

Dated:    Brooklyn, New York
          March 6, 2006

                              ____/s/_____
                              MARILYN D. GO
                              UNITED STATES MAGISTRATE JUDGE